IN THE SUPREME COURT OF MISSISSIPPI
NO. 93-CA-01368-SCT

*GEORGE WILLIAMS, EXECUTOR OF THE ESTATE
OF CHARLES M. WILLIAMS, DECEASED;
GEORGE WILLIAMS, INDIVIDUALLY, AND MARY
WILLIAMS*

*v.*

*JOE SAM OWEN*

**THIS OPINION IS NOT DESIGNATED FOR PUBLICATION AND MAY NOT BE CITED,
PURSUANT TO M.R.A.P. 35-A**

| | |
|---|---|
| DATE OF JUDGMENT: | 11/01/93 |
| TRIAL JUDGE: | HON. MICHAEL L. CARR, JR. |
| COURT FROM WHICH APPEALED: | HARRISON COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANTS: | FLOYD J. LOGAN |
| ATTORNEY FOR APPELLEE: | WYNN E. CLARK |
| NATURE OF THE CASE: | CIVIL - OTHER |
| DISPOSITION: | REVERSED AND RENDERED - 09/04/97 |
| MOTION FOR REHEARING FILED: | 9/18/97 |
| MANDATE ISSUED: | 11/13/97 |

**BEFORE SULLIVAN, P.J. , SMITH AND MILLS, JJ.**

**SULLIVAN, PRESIDING JUSTICE, FOR THE COURT:**

**FACTUAL BACKGROUND**[1]

In 1977 Charles Williams (hereinafter "Charles") formed a partnership with his first cousin Joe Sam Owen (hereinafter "Owen") in an effort to build a night club in Gulfport, Mississippi. Although Charles and Owen never formally entered into a partnership agreement, there is no dispute that they were in fact business partners in this particular endeavor. In order to finance their project, on October 26, 1977, Charles and Owen secured a loan of $250,000 from Hancock Bank (referred to in the Factual Background as "bank"). Both Charles and Owen signed a promissory note as co-makers, making them both jointly and severally liable for the repayment of the loan. Charles and Owen used the loan to purchase a piece of beachfront property and to construct the night club. For security purposes, the bank required a deed of trust on the property and building and a $5,000 savings account. Although not required by the bank, on January 16, 1978, Charles voluntarily purchased a term life insurance policy from Nationwide Insurance Company (hereinafter "Nationwide"). The face

value of the policy was $200,000 with an accidental death rider for an additional $100,000. Charles named the "Hancock Bank (Business Loan)" as the primary beneficiary of the insurance policy, with his parents, George and Mary Williams (referred to in the Factual Background as "the Williamses"), as contingent beneficiaries. At all times, Charles made life insurance premium payments from his personal checking account. Realizing that the initial $250,000 loan was insufficient to complete the night club, Charles and Owen secured an additional loan of $50,000 from the bank on April 20, 1978. Charles and Owen both signed a promissory note on the new loan as co-makers, making them both jointly and severally liable for repayment. The second loan was secured by the original deed of trust. Construction of the building was completed, and the club opened for business as the Shy Anne Social Club.

In 1984, Charles executed a will in which he devised his interest in the beach club, land, and building to his mother, Mary Williams. In June of 1986, Charles individually borrowed $48,000 from the bank for a solo project which did not involve the partnership. On October 24, 1986, Charles died. Following Charles's death, Nationwide contacted the bank to inform the bank that it was the beneficiary on a $200,000/$300,000[2] life insurance policy which Charles had owned. Nationwide requested information from the bank as to Charles's total debt owed the bank at the time of his death. The bank informed Nationwide that Charles was indebted to the bank in the principal sum of $246,161.56. This sum included the remaining debt on the two Williams-Owen notes plus the individual loan he had received in June of 1986. On December 11, 1986, Nationwide sent a check to the bank in the amount of $200,252.86 representing the face value of the life insurance policy and a premium refund of $252.86. After additional investigation, Nationwide honored the $100,000 accidental death coverage, and on February 12, 1987, Nationwide forwarded another check to the bank in the amount of $46,908.70. Both checks of $200,252.86 and $46,908.70, were enough to satisfy both Charles's individual and partnership debts to the bank. After Charles's debts had been satisfied, the sum remaining from the $300,000 life insurance policy was disbursed to Charles's parents as contingent beneficiaries.

Unbeknown to Owen, after the insurance proceeds were disbursed to the bank, George and Mary Williams contacted the bank vice-president and began negotiations for an agreement. The agreement included a commitment by the bank to delay the application of the insurance proceeds to the Williams-Owen partnership notes in order to prevent a satisfaction of the notes by the insurance proceeds alone. Since Owen co-signed the notes with Charles, the Williamses felt that Owen should also contribute to the repayment in an equitable 50%-50% proportion. The agreement was executed by the bank and George and Mary Williams on February 23, 1987. Although the bank had no legal obligation to enter into the agreement with the Williamses, the bank president and vice-president were long time friends of the Williamses and were sympathetic to their plight. Pursuant to the agreement, the bank temporarily delayed the application of the insurance proceeds to the partnership debts, immediately satisfied Charles's individual debts, and placed the remaining proceeds in an interest bearing escrow account under the name of George Williams. As part of the escrow agreement, the bank retained full control over the disposition of the funds deposited in the account, including the right to apply the full amount to the repayment of the partnership notes. The bank, however, promised not to exercise this right until after May 1, 1987, the grace period of which could be extended beyond May 1, 1987, with the consent of both parties. It was not until after the full probate of Charles's estate that Owen became aware of the life insurance policy, the status of the

bank as beneficiary of said policy, and the agreement between the Williamses and the bank.

On July 8, 1987, the bank filed a complaint for declaratory judgment naming Joe Sam Owen, George Williams as Charles Williams' executor, and George and Mary Williams, individually, as defendants. In the complaint, the bank sought a declaration on the rights, status, and legal relationships of all parties as to the promissory notes, the deed of trust, and the insurance proceeds held by the bank in escrow. Owen answered and counterclaimed against the bank seeking a judgment directing the bank to apply, in full, the insurance proceeds together with accrued interest to the partnership notes for full satisfaction and discharge of the notes and the deed of trust. The Williamses answered seeking various forms of relief. First the Williamses denied that the bank had the right to apply the insurance proceeds to the partnership debts, claiming that the bank had the right to satisfy only Charles's individual debts. Second, the Williamses requested that if the court determined that the proceeds were applicable to the partnership debts, that only the proceeds necessary to satisfy 50% of the partnership debt be applied, representing Charles's ½ interest in the partnership. Third, if the court applied any portion of the proceeds to the partnership debt, that the court order the bank to assign to the Williamses the deed of trust and promissory notes held by the bank, or impose an equitable lien against the partnership. Owen again counterclaimed against the bank seeking application of the proceeds for complete satisfaction of the partnership debts alleging tortious interference of business rights by the bank. Owen also cross-claimed against George and Mary Williams, claiming wrongful, intentional, and concealed abatement of insurance monies and intentional injurious falsehoods to seek economic gain.

Owen's cross-claims against the Williamses were bifurcated by an order entered in June of 1988, with a portion of the litigation being transferred to the Harrison County Circuit Court. However, on the remaining issues, Chancellor Barnett issued a bench ruling in favor of Owen and found that Charles Williams intended to benefit the partnership when he voluntarily acquired the insurance policy and named the bank as beneficiary *pro tanto*. A final judgment was entered by the chancellor on July 25, 1988, declaring that the joint and several partnership notes of Charles and Owen were to be fully satisfied by the insurance proceeds along with a release of the deed of trust and the $5,000 savings account. Furthermore, although the bank had placed the insurance proceeds in an interest bearing escrow account, the interest accumulating on the funds in escrow was insufficient to offset the interest charged on the partnership notes resulting in a deficiency amount of $5,492.39, which the court charged to George and Mary Williams. The final judgment also denied any right of contribution, subrogation, or assignment by the Williamses against Owen.

## STATEMENT OF THE CASE AND FACTS

The chancery court's judgment was appealed to this Court, which rendered a decision cited ***Williams v. Owen***, 613 So. 2d 829 (Miss. 1993), (hereinafter "***Williams I***")[3]. On August 29, 1988, the bank followed the directive of the chancery court and satisfied the partnership notes with the insurance proceeds and canceled the deed of trust. Since the Williamses were contingent beneficiaries of the insurance policy and stood to receive monies over and above that which was necessary to satisfy Charles's debts, the issue considered on appeal was whether the chancery court should have ordered contribution from Owen to the Williamses for the satisfaction of the partnership debt. While ***Williams I*** was on appeal, on February 28, 1991, the Williamses and Owen entered into a Settlement Agreement which, *inter alia*, dismissed pending claims in all courts except the Supreme Court of

Mississippi, and set forth a transfer of Owen's ½ interest in the night club to Mary Williams for a consideration of $115,000, of which $100,000 would be placed in escrow by Owen at Peoples Bank (hereinafter "bank") pending final disposition of **Williams I** by this Court. In accordance with the Escrow Agreement, the Settlement Agreement further stated in part:

> With reference to the pending case before the Mississippi Supreme Court, the $100,000.00 to be maintained in a savings account at Peoples Bank shall be paid by the escrow agent immediately upon issuance of the mandate from the Mississippi Supreme Court. In the event the order of the Chancery Court is affirmed, or in the event it is determined by the Mississippi Supreme Court that no monies are owed by Joe Sam Owen, individually, or as a result of an adjustment of the partnership capital accounts as a result of the insurance policy to either Estate of Charles Williams or George Williams, Mary Owen Williams, Mary Margaret Williams Wood or Michael Owen Williams, the escrow agent shall pay the account balance to Joe Sam Owen. In the event the Mississippi Supreme Court determines that a sum certain is due to the Estate of Charles Williams or George Williams, Mary Owen Williams, Mary Margaret Williams Wood or Michael Owen Williams with reference to the insurance proceeds, plus interest, which is less than said $100,000.00, then said sum shall be paid from the savings account referenced herein by the escrow agent directly to the individual so ordered to be paid by the Mississippi Supreme Court and the balance, if any, to Owen. If the Mississippi Supreme Court determines that a sum of greater than $100,000.00 is due to the Williamses, either personally from Joe Sam Owen, or as a result of the increase in Charles Williams' Capital Account in the Partnership as a result of the decision, then the $100,000.00, plus interest, shall be paid to the Williamses by the escrow agent and the balance over $100,000.00, plus interest, shall be paid immediately to the Williamses by Joe Sam Owen. The parties to this agreement covenant that upon final disposition of the case before the Mississippi Supreme Court neither party will unnecessarily delay or cause to be unnecessarily delayed the distribution of the savings account funds in accord with the Mississippi Supreme Court decision.

This Settlement Agreement was approved by the chancery court on March 4, 1991.

On August 19, 1992, this Court rendered an opinion in **Williams I** which reversed the chancery court's decision in part and rendered a judgment which entitled the Williamses to $99,015 in contribution from Owen representing his ½ of the partnership debt. Furthermore, the opinion affirmed the chancery court's holding that the Williamses should pay the $5,492.39 interest deficiency. The Williamses filed a Motion to Allow Interest on Judgment on October 19, 1992, which was denied by the Court on November 19, 1992. On November 19, 1992, Owen's counsel sent a letter to the bank requesting that the bank disburse the funds in Owen's escrow account pursuant to the Settlement Agreement in order to satisfy the Supreme Court's mandate concerning contribution on the partnership note. On November 25, 1992, the Williamses sent a Motion to Reconsider or In the Alternative, For Clarification By Written Order to the Clerk of the Supreme Court which was subsequently not filed and returned to the Williamses pursuant to Rule 40 of the Mississippi Rules of Appellate Procedure. Also on November 25, 1992, the Williamses sent a letter to the bank informing the bank of matters pending at the Supreme Court concerning the interest. On December 4, 1992, the Williamses' counsel made *ex parte* contacts with Magistrate Judge Jack B. Weldy of the Supreme Court to discuss the Court's handling of the interest issue. On December 7, 1992, the Williamses' counsel sent Judge Weldy a letter which included the Williamses' Motion to Reconsider or In the

Alternative, For Clarification By Written Opinion which had already been returned by the Clerk of the Supreme Court for noncompliance with Rule 40. On December 18, 1992, the Williamses' counsel sent a letter to the bank informing the bank that the matter before the Supreme Court regarding interest had not been concluded because the Supreme Court's decision was not final. On December 24, 1992, the bank wrote a letter to Owen to inform him that the bank intended to disburse $99,015 to the Williamses and $9,446.79 to Owen from the escrow account on December 31 as directed by the Supreme Court. On December 29, 1992, the Williamses' counsel wrote a letter to the bank agreeing to the disbursement of the $99,015 to the Williamses, but further saying that a disbursement of the $9,446.79 may constitute a breach of the Escrow Agreement. On December 31, 1992, the bank paid $99,015 from the escrow account to the Estate of Charles Williams in order to satisfy Owen's ½ portion of the partnership debts; the bank disbursed the remainder $9,446.79 from the escrow account to Owen. On January 28, 1993, the Court revised the *Williams I* opinion and mandate which were subsequently handed down and published at 613 So. 2d 837. The effect of the mandate was the same as the mandate rendered on August 19, 1992, but further remanded the case to the chancery court for determinations as to interest and distribution. *Williams I* at 837. The Court's mandate stated:

> AFFIRMED IN PART; REVERSED AND RENDERED IN PART. THE INTEREST DEFICIENCY IN THE AMOUNT OF $5,492.39 (PLUS ACCRUING INTEREST AT 8% ANNUM) WHICH WAS CHARGED TO GEORGE AND MARY WILLIAMS IS AFFIRMED. JUDGMENT ENTERED HERE FOR GEORGE WILLIAMS, AS EXECUTOR FOR THE ESTATE OF CHARLES M. WILLIAMS AGAINST JOE SAM OWEN IN THE AMOUNT OF $99,015. REMANDED FOR FURTHER ACTION AS TO INTEREST AND DISTRIBUTION CONSISTENT WITH THIS OPINION. JOE SAM OWEN IS TAXED WITH ALL COSTS OF THIS APPEAL[4].

*Williams I* at 837. On February 2, 1993, the Williamses' counsel wrote a letter to the bank with the Supreme Court's revised opinion and mandate attached and suggested that the bank have Owen return the $9,446.79 escrow disbursement pending a determination by the chancery court as to interest due the Williamses and further informed the bank of potential legal proceedings against the bank for appropriate damages as a result of the escrow disbursement. On February 19, 1993, the Williamses' counsel wrote to Judge Carr, the judge to whom this case was remanded, and invited Judge Carr to contact Presiding Justice Dan M. Lee of the Supreme Court for a clarification of the revised mandate. On February 22, 1993, Judge Carr wrote a letter to the Williamses' counsel in response to counsel's letter of February 19, and informed counsel that he believed it was improper for a judge to contact a Supreme Court justice concerning a case over which that judge had presided. In response to the Court's opinion of January 28, on February 25, 1993, the Williamses filed a Motion for Clarification of the Mandate which was denied by the Court on March 17, 1993.

Upon remand, the chancery court considered whether to require Owen to pay the Williamses interest on the contribution from August, 29, 1988, the date on which the partnership debts were satisfied with the insurance proceeds, to December 31, 1992, the date on which contribution was payed to the Williamses from Owen's escrow account. On November 1, 1993, the chancery court rendered judgment denying the Williamses motion for interest on the contribution. In explaining the chancery court's ruling, the chancellor stated:

. . . I think that the Supreme Court has in effect by its handling of the matter determined that the claim for interest should be denied. I think it ought to be denied again. I can't see that there's any additional reason necessary. To me the parties settled their claim, and they bought their peace in a settlement agreement and an escrow agreement that they executed in February of 1991. They agreed to let the Supreme Court handle the matter. They made specific provisions for the distribution of the account by the bank. They agreed that if a sum certain was due to the estate less the amount on deposit then the sum ordered shall be paid from the account by the escrow agent directly to the individual so ordered to be paid by the Court and the balance of the account, if any, should be paid to Owen.

. . . The $99.015 was ordered to be paid to the Estate. I think the Supreme Court intended to and I think it did adjust the equities between the parties by awarding that sum certain to the Estate and affirming the judgment against the Williamses for the amount of interest.

. . . .

The intent of the order was to give Court approval to the parties' agreement and the order and the agreements were interpreted together because the order was based on the parties' understanding and agreements. Of course, the interest that was referred to in there referred to interest, if any, ordered to be paid by the Supreme Court. Now to this date, the Supreme Court has not ordered Mr. Owen to pay any interest. They have had several opportunities. The substitute mandate and the opinion [of January 28, 1993] do not order Owen to pay anyone interest. It does order the Williamses to pay interest on that little amount that they had there that they worked with [sic].

On November 29, 1993, the Williamses appealed the chancery court's ruling.

## SUMMARIZED CHRONOLOGY OF EVENTS

In order to aid the analysis, the following dates and descriptions illustrate a brief summary of the chronology of relevant events:

**October 26, 1977** - Charles and Owen secured a loan of $250,000 from Hancock Bank in order to finance a partnership endeavor to build a night club in Gulfport, Mississippi.

**January 16, 1978** - Charles purchased a term life insurance policy from Nationwide Insurance Company. The face value of the policy was $200,000 with an accidental death rider for an additional $100,000. The primary beneficiary of the policy was the Hancock Bank (Business Loan). The contingent beneficiaries were George and Mary Williams.

**April 20, 1978** - Charles and Owen secured an additional loan from Hancock Bank for $50,000 in order to complete the building project.

**1984** - Charles executed a will in which he devised his interest in the beach club, land, and building to his mother, Mary Williams.

**June of 1986** - Charles individually borrowed $48,000 from Hancock Bank for a solo project which did not involve the partnership.

**October 24, 1986** - Charles Williams died.

**December 11, 1986** - Nationwide Insurance Company sent a check to Hancock Bank in the amount of $200,252.86 representing the face value of the life insurance policy and a premium refund.

**February 12, 1987** - Nationwide Insurance Company sent another check to Hancock Bank in the amount of $46,908.70 from the accidental death rider on the life insurance policy.

**February 23, 1987** - Hancock Bank and George and Mary Williams executed an agreement whereby Charles's personal debts (from the $48,000 loan) would be satisfied immediately with the proceeds from the insurance policy, while the remaining proceeds would be placed in an interest bearing escrow account and would not immediately go towards satisfying the partnership debts of $198,029.29 (from the total loan of $250,000 to the partnership.)

**July 8, 1987** - Hancock Bank filed a complaint for declaratory judgment for a declaration on the rights, status, and legal relationships of all parties.

**July 25, 1988** - Chancellor Barnett held that the partnership debts were to be satisfied in full from the life insurance proceeds held in escrow by the bank, that the estate of Charles Williams had no right to contribution from Owen on the partnership debts, and that the Williamses were required to pay the $5,492.39 in interest deficiency.

**August 29, 1988** - The partnership debts and the interest deficiency were satisfied with the proceeds from the life insurance policy.

**February 28, 1991** - The Williamses and Owen entered into a Settlement Agreement, settling claims and detailing the disposition of $100,000 placed by Owen into escrow contingent upon the holding by the Mississippi Supreme Court in *Williams I*.

**March 4, 1991** - The Settlement Agreement was approved by the chancery court and the case involving the dissolution of the partnership was dismissed.

**August 19, 1992** - Supreme Court rendered the initial opinion in *Williams I*.

**October 19, 1992** - The Williamses filed a Motion to Allow Interest on Judgment.

**November 19, 1992** - Supreme Court denied the Williamses' Motion to Allow Interest on Judgment.

**November 19, 1992** - Owen's counsel sent a letter to the bank requesting disbursement on the funds in the escrow account pursuant to the Settlement Agreement in order to satisfy the Supreme Court's mandate concerning contribution on the partnership note.

**November 25, 1992** - The Williamses sent a Motion to Reconsider or In The Alternative, For Clarification By Written Opinion to the Clerk of the Supreme Court.

**November 25, 1992** - The Williamses sent a letter to the bank informing the bank of matters pending at the Supreme Court concerning the interest.

**December 1, 1992** - The clerk of the Supreme Court returned the Williamses' Motion to Reconsider or In The Alternative, For Clarification By Written Opinion without filing it pursuant to Rule 40 of the Mississippi Rules of Appellate Procedure.

**December 4, 1992** - The Williamses' counsel made *ex parte* contact with Magistrate Judge Jack B. Weldy of the Supreme Court to discuss the Court's handling of the interest issue.

**December 7, 1992** - The Williamses' counsel sent Judge Weldy a letter which included the Motion to Reconsider or In The Alternative, For Clarification By Written Opinion of November 25.

**December 18, 1992** - The Williamses' counsel sent a letter to the bank informing them that the matter before the Supreme Court regarding interest had not been concluded because the Supreme Court's decision was not final.

**December 24, 1992** - The bank wrote a letter to Owen informing him that the bank intended to disburse $99,015 to the Williamses and $9,446.79 to Owen from the escrow account on December 31, 1992 as directed by the Supreme Court.

**December 29, 1992** - The Williamses' counsel wrote a letter to the bank agreeing to the disbursement of the $99,015 to the Williamses, but further saying that a disbursement of the $9,446.79 may constitute a breach of the Escrow Agreement.

**December 31, 1992** - The People's Bank paid $99,015 from the escrow account established by Owen on February 28, 1991, to the Estate of Charles Williams to satisfy Owen's ½ portion of the partnership debts; the remainder $9,446.79 from the escrow account went to Owen.

**January 28, 1993** - The Supreme Court issued a revised opinion and mandate for *Williams I* affirming the requirement that the Williamses pay the $5,492.39 for the interest deficiency and reversing and rendering in part requiring that Owen pay the estate of Charles Williams $99,015 for contribution on the partnership debts and remanded for a determination as to interest and distribution.

**February 2, 1993** - The Williamses' counsel wrote a letter to the bank with the Supreme Court's revised opinion and mandate attached and suggested that the bank have Owen return the $9,446.79 disbursement pending a determination by the Court as to the interest due the Williamses and further informed the bank of potential legal proceedings there for appropriate damages as a result of the disbursement.

**February 19, 1993** - The Williamses' counsel wrote to Judge Carr and invited Judge Carr to contact Presiding Justice Dan M. Lee of the Supreme Court for a clarification of the revised mandate.

**February 22, 1993** - Judge Carr wrote the Williamses' counsel in response to the letter of February 19, and said that he considered it improper for a judge to contact a Supreme Court justice concerning a case over which that judge presided.

**February 25, 1993** - The Williamses filed a Motion for Clarification of the Mandate in the Supreme Court.

**March 17, 1993** - The Supreme Court denied the Williamses' Motion for Clarification of the Mandate.

**November 1, 1993** - On remand, the chancery court denied the Williamses' claim for interest on the contribution.

**November 29, 1993** - The Williamses filed a Notice of Appeal thus sending *Williams II* to the Supreme Court.

## STATEMENT OF THE LAW

## STANDARD OF REVIEW

When this Court reviews findings of fact made by a chancellor, those findings should not be disturbed when the findings are supported by substantial evidence unless the chancellor was manifestly wrong, clearly erroneous, or if the chancellor applied an erroneous legal standard. *Stevenson v. Stevenson*, 579 So. 2d 550, 551-52 (Miss. 1991); *Southern v. Glenn*, 568 So. 2d 281, 287 (Miss. 1990). When this Court considers a question of law rather than a question of fact, the standard of review applied is *de novo*. *Stevenson v. Stevenson*, 579 So. 2d at 553; *Planters Bank & Trust Co. v. Sklar*, 555 So. 2d 1024, 1029 (Miss. 1990).

### I.

## WHETHER THE WILLIAMSES, WHO HAVE A LAWFUL RIGHT TO CONTRIBUTION AGAINST OWEN, ALSO HAVE A RIGHT TO INTEREST ON THE CONTRIBUTION?

Neither party contests the right of the Williamses to recover contribution from Owen for the satisfaction of the partnership debt. Moreover, it has been established in Mississippi case law that when one co-obligor has satisfied a debt with an amount in excess of their proportional obligation, the paying co-obligor has a right to contribution against the nonpaying co-obligor for their proportional amount. *Celotex Corp. v. Campbell Roofing and Metal Works, Inc.*, 352 So. 2d 1316, 1318 (Miss. 1977). The only issue in dispute is whether the Williamses can recover interest on the contribution from Owen. The Williamses argue that since the bank was the primary beneficiary of Charles's life insurance policy and the Williamses were the contingent remainder beneficiaries, and since the partnership debts were satisfied on August 29, 1988, with payments to the bank from the proceeds of the life insurance policy and the remainder of the proceeds went to the Williamses, and since the contribution on the partnership debts in the amount of $99,015 were not received by the Williamses until December 31, 1988, that as a matter of law the Williamses should receive interest on the $99,015 at the legal rate from August 29, 1988, to December 31, 1992. Owen, however, argues that pursuant to pure equity, there is no hard and fast rule or case law that states that as a matter of law one has the right to interest on an equitable contribution. There is no Mississippi case law directly addressing the issue concerning the right to interest on a contribution. As a general rule, a judgment *may* include interest on the amount of contribution from the date on which payment was made on the principal obligation to the date on which the right to contribution was satisfied. 18 Am. Jur. 2d, *Contribution* § 134. It has also been said that:

> Payment of the entire joint obligation by one of several obligors has been compared to the

situation arising when money has been lent or advanced to the use of the others, and, being founded upon a money transaction under the implied promise to repay, entitles the person paying the entire debt to interest on the money for which contribution arises from the date of such payment, apparently without the necessity of prior demand.

27 A.L.R.2d 1268, 1272. Some courts have held that interest on contributions can be awarded in some instances. In *Allen v. Fairbanks*, 45 F. 445 (C.C.D. Vt., 1891), the court held that where a stockholder is compelled to pay a corporate debt for which another stockholder is equally liable, upon a theory of a quasi monetary advancement, an action seeking contribution includes the right to recover interest from the date the debt was satisfied. *Allen v. Fairbanks*, 45 F. 445, 447-48 (C.C.D. Vt. 1891). In 1959, a federal district court in Iowa held that when the right to contribution existed for one railroad company against another for a personal injury claim for which they were both liable, such a right to contribution carries with it the right to recover interest thereon from the date of payment. *Chicago and North Western Railway Co. v. Chicago, Rock Island & Pacific Railroad Co.*, 179 F. Supp. 33, 63 (N.D. Iowa 1959), *aff'd*, 280 F.2d 110 (8th Cir. 1960). The Supreme Court of Nebraska, in 1946, held that when a co-debtor has a right to contribution against other co-debtors for payment in excess of his proportionate share, the contribution payments made are subject to the legal rate of interest from the date of payment. *Exchange Elevator Co. v. Marshall*, 22 N.W.2d 403, 413 (Neb. 1946). In *Appleford v. Snake River Mining, Milling & Smelting Co.*, 210 P. 26 (Wash. 1922), a co-guarantor repaid the principal of certain notes in full, plus interest. The guarantor then filed suit against the other co-guarantors and the original debtor seeking contribution for their proportional share plus interest. The Supreme Court of Washington held that the original guarantor could recover contribution from the others plus interest at the legal rate from the date of payment. *Appleford v. Snake River Mining, Milling & Smelting Co.*, 210 P. 26, 29 (Wash. 1922). This Court has held that in cases involving the enforcement of contractual obligations for the payment of money, where the right to recover interest is fixed by statute, interest will be imposed as part of the recovery, not for punitive purposes but simply as compensation for the detention of money overdue. *Rubel v. Rubel*, 75 So. 2d 59, 69 (Miss. 1954); *see also Broadhead v. Stack*, 244 So. 2d 382, 385 (Miss. 1971) (citing *Rubel supra* and upholding the interest assessed against a joint venturer in a suit for accounting).

Therefore, there is a patchwork of cases involving co-debtors, joint torfeasors, co-guarantors, and contractual obligations where interest on contributions have been upheld. A common thread implicit throughout these various cases, is the theory that in money transactions or relationships involving money, a right to contribution for monetary forfeitures in excess of one's legal obligations carries with it the right to recover interest on that money for the period of time the money was inaccessible to the rightful owner. This is an equitable theory which treats monies contributed over and above one's proportional obligation as money lent or advanced for the use of another and reimburses one for the interest they could have received had that money been under their control. C.S. Patrinelis, Annotation, *Rights of one entitled to contribution to recover interest*, 27 A.L.R. 1268, 1270 (1953).

In the case *sub judice*, although the money from the life insurance policy did not initially belong to the Williamses, they had a contingent remainder interest in the money over and above that which was necessary to satisfy Charles's personal and partnership debts. It was this contingent remainder interest which was adversely affected when the life insurance proceeds went towards the payment of the partnership debts in full leaving the Williamses with less remainder proceeds than they would have

received had the partnership debts been satisfied on a *pro rata* basis. Charles's personal debt and the partnership debt were satisfied in full with the life insurance proceeds on August 29, 1988. The remaining insurance proceeds went to Charles's parents as contingent beneficiaries of the insurance policy. *Williams I* at 832. It was at this point that the Williamses were deprived of $99,015 from the insurance proceeds they would have received had the partnership debt been satisfied by both the insurance proceeds and Owen on a *pro rata* basis. It was not until December 31, 1992, that the Williamses were compensated with $99,015 for Owen's *pro rata* share of the partnership debt. This money was paid to the Williamses from the escrow account established by Owen pursuant to the Settlement Agreement. Therefore, it was from August 29, 1988, to December 31, 1992, that the Williamses were deprived of $99,015 which this Court found them to be rightfully entitled. *Williams I* at 836-37. Although not previously established in Mississippi case law, an equitable remedy in this situation includes interest on the $99,015 at the legal rate for the period of time the Williamses were deprived of money to which they were rightfully entitled. Therefore, the past dispositions of this case were not in accord with principles of equity in a contribution setting.

## II.

### WHETHER THE WILLIAMSES AND OWEN INTENDED TO INCLUDE WITHIN THEIR SETTLEMENT AGREEMENT PAYMENTS OF INTEREST ON THE CONTRIBUTION?

The parties are in dispute as to their intent by including the word "interest" in the Settlement Agreement. The Williamses argue that the word "interest" was included in the Settlement Agreement to provide a payment of interest on the sum ordered contributed by the Supreme Court. Owen, however, argues that the "interest" in the Settlement Agreement refers only to the interest which would have accrued on the $100,000 he placed in escrow to satisfy the sum ordered contributed. Moreover, Owen avers that there was a direct relation between the $100,000 amount placed in escrow and the amount the parties estimated might be ordered payed by this Court. Owen argues that since the partnership debt was $198,029.29, the estimated amount to be contributed would be roughly $100,000, hence the amount placed in escrow. Owen states that if there had been intent to include interest on the contribution, which would have been near $30,000, he would not have entered into the Settlement Agreement. Owen further says that "it was the parties' clear intent to dispose of the case by depositing the sum certain of $100,000. The interest earned on the escrow account was to take care of the judgment of $5,492.39 if the Supreme Court reversed that part of the original judgment."

The relevant portion of the Settlement Agreement mirrors language in the Escrow Agreement and states in relevant part:

> With reference to the pending case before the Mississippi Supreme Court, the $100,000.00 to be maintained in a savings account at Peoples Bank shall be paid by the escrow agent immediately upon issuance of the mandate from the Mississippi Supreme Court. In the event the order of the Chancery Court is affirmed, or in the event it is determined by the Mississippi Supreme Court that no monies are owed by Joe Sam Owen, individually, or as a result of an adjustment of the partnership capital accounts as a result of the insurance policy to either Estate of Charles Williams or George Williams, Mary Owen Williams, Mary Margaret Williams Wood or Michael Owen Williams, the escrow agent shall pay the account balance to Joe Sam Owen.

> In the event the Mississippi Supreme Court determines that a sum certain is due to the Estate of Charles Williams or George Williams, Mary Owen Williams, Mary Margaret Williams Wood or Michael Owen Williams with reference to the insurance proceeds, *plus interest*, which is less than said $100,000.00, then said sum shall be paid from the savings account referenced herein by the escrow agent directly to the individual so ordered to be paid by the Mississippi Supreme Court and the balance, if any, to Owen. If the Mississippi Supreme Court determines that a sum of greater than $100,000.00 is due to the Williamses, either personally from Joe Sam Owen, or as a result of the increase in Charles Williams' Capital Account in the Partnership as a result of the decision, then the $100,000.00, *plus interest*, shall be paid to the Williamses by the escrow agent and the balance over $100,000.00, *plus interest*, shall be paid immediately to the Williamses by Joe Sam Owen.

(Emphasis added). In construing documents contractual in nature "[t]he rules for the construction of . . . contracts are designed to ascertain and to follow the actual or probable intention of the parties." *Sumter Lumber Co. v. Skipper*, 184 So. 296, 298 (Miss. 1938). When a contract is clear and unambiguous "the court [sic] looks solely to the language used in the instrument itself, and will give effect to each and all its parts as written." *Id*. However, where the instrument is not clear and is ambiguous, the Court will consider extrinsic evidence to aid in ascertaining the meaning of the instrument and the intent of the parties. *Id*. Although the first rule of contract interpretation is to give effect to the intent of the parties, it is more important to interpret what in fact the parties said; the words employed in the instrument itself are the best resource for ascertaining intent and assigning meaning with fairness and accuracy. *UHS-Qualicare, Inc. v. Gulf Coast Community Hospital, Inc.*, 525 So. 2d 746, 754 (Miss. 1987).

The arguments proffered by both Owen and the Williamses require a simple analysis of sentence structure and interpretation in order to determine if the Settlement Agreement is truly ambiguous or if the meaning and intent of the parties can be ascertained from the document itself. The first sentence in question utilizing the word "interest" states:

> In the event the Mississippi Supreme Court determines that a sum certain is due to the Estate of Charles M. Williams or Mary Williams, George Williams, Mary Margaret Williams Wood or Michael Owen Williams with reference to the insurance proceeds, *plus interest*, which is less than said $100,000.00 [in escrow], then said sum shall be paid from the savings account referenced herein by the escrow agent directly to the individual so ordered to be paid by the Mississippi Supreme Court and the balance if any to Owen.

(Emphasis added). In this sentence, the words "plus interest" follow quickly upon the heels of the words "insurance proceeds," and is a clause prior to and independent from the clause, "which is less than said $100,000." Therefore, the words "plus interest" reference and modify "insurance proceeds" and not the $100,000 in the escrow account. It appears clear from grammatical interpretation that in this particular sentence the word "interest" was intended to refer to that interest which would have accrued on the *insurance proceeds*.

The next sentence in the Settlement Agreement requiring analysis states:

> If the Mississippi Supreme Court determines that a sum of greater than $100,000.00 is due to the Williamses, either personally from Joe Sam Owen, or as a result of the increase in Charles

Williams' Capital Account in the Partnership as a result of the decision, then the $100,000.00, *plus interest*, shall be paid to the Williamses by the escrow agent and the balance over $100, 000.00, *plus interest*, shall be paid immediately to the Williamses by Joe Sam Owen.

(Emphasis added). In both instances, the words "plus interest" immediately follow the amount of "$100,000." Therefore, it appears that the words "plus interest" modify the $100,000 amount in escrow. In this sentence, to interpret the words "plus interest" to refer to the sum owed the Williamses would require a stretch of the imagination embracing unlikely doctrines of grammatical interpretation.

In light of these interpretations, the Settlement Agreement clearly suggests that if the Supreme Court ordered that a sum certain plus interest thereon be paid by Owen to the Williamses, that such would first be satisfied with the $100,000 in escrow plus interest thereon, and that any sum over the $100, 000 in escrow plus interest would be paid directly by Owen. Thus both the arguments made by Owen and the Williamses are correct taken together, but narrowly inconsistent with grammatical interpretation when considered independently. Thus the intent of the parties as taken from the words of the Settlement Agreement unambiguously encompass both the interest on the insurance proceeds and interest on the money in escrow.

## III.

## WHETHER THE CLAIM FOR INTEREST IS BARRED BY RES JUDICATA?

On October 19, 1992, the Williamses filed a Motion to Allow Interest on Judgment with this Court. On November 19, 1992, this Court denied the motion without stating a legal basis thereon. Owen argues that the Motion to Allow Interest was fully briefed and this Court's denial of that motion was a final adjudication and that principles of *res judicata* bar a subsequent review by the chancery court of a claim for interest. The Williamses, however, argue that, although the Supreme Court denied the Motion to Allow Interest on Judgment, in the amended mandate the Court remanded the issue to the trial court for a determination as to the dates necessary to calculate the interest on Owen's half of the partnership debt. The issue concerning *res judicata* can be adequately analyzed by considering the doctrine's traditional application.

The doctrine of *res judicata* "prevents litigation of all grounds for, or defenses to, recovery that were previously available to the parties, regardless of whether they were asserted or determined in a prior proceeding." **Brown v. Felsen**, 442 U.S. 127, 131, 99 S. Ct. 2205, 2209, 60 L. Ed. 2d 767 (1979); **Key v. Wise**, 629 F.2d 1049, 1063 (5th Cir. 1980), *reh'g denied*, 645 F.2d 72 (5th Cir. 1981), *cert. denied*, 454 U.S. 1103, 102 S. Ct. 682, 70 L. Ed. 2d 647 (1981); **Dunaway v. W.H. Hopper & Assoc., Inc.**, 422 So. 2d 749 (Miss. 1982). Where a claim has undoubtedly been adjudicated in full in a former action, the doctrine of *res judicata* may be invoked precluding further consideration of the issue. **True-Hixon Lumber Co. v. Thorn**, 158 So. 909, 911 (Miss. 1935). However, many courts have held that the doctrine of *res judicata*, in its strictest sense, does not apply to orders on motions in the same sense as a judgment, particularly with respect to matters not involved in the determination of the case. **Ferretti v. Dulles**, 246 F.2d 544, 547 (2nd Cir. 1957); **In re Walton Hotel Co.**, 116 F.2d 110, 112 (7th Cir. 1940); **Warthen v. U.S.**, 157 Ct. Cl. 798 (Ct. Cl. 1962); **O'Brien v. City of Santa Monica**, 33 Cal. Rptr. 770, 770, (Cal. Dist. Ct. App. 1963); **Kenny v. Citizens Nat. Trust & Sav. Bank of Los Angeles**, 269 P.2d 641, 655 (Cal. Dist. Ct. App. 1954); **Chesnow v. Nadell**, 47 N.W.2d

666, 668 (Mich. 1951); ***Anderson v. Sundstrom***, 241 N.W.2d 82, 86, (Minn. 1976); ***Hustad v. Reed***, 321 P.2d 1083, 1091 (Mont. 1958); ***Davis v. Davis***, 252 S.W.2d 521, 524 (Mo. 1952); ***Baranowitz v. Baranowitz***, 176 N.Y.S.2d 856 (N.Y. App. Div. 1958); ***Maxim v. Maxim***, 118 N.Y.S.2d 541, 547 (N.Y. Dom. Rel. Ct. 1952); ***Taub v. Merriam***, 380 A.2d 1245, 1247-48 (Pa. Super. Ct. 1977); 60 C.J.S. *Motions & Orders* § 65(g) (1969 and Supp. 1997). Moreover, when a motion or a claim is dismissed "without prejudice," or without assessment of the relative merits thereof, *res judicata* is not applicable and will not prevent reconsideration. ***Ruffin v. ITT Continental Baking Co.***, 636 F. Supp. 857, 858 (N.D. Miss. 1986); ***see also Parsons-May-Oberschmidt Co. v. Furr***, 70 So. 895, 896 (Miss. 1916) (although the Supreme Court denied an original motion based on its inability to entertain a motion on matters in the first instance, the motion was amenable to consideration by a lower court subject to appellate review); *cf.* ***St. Louis-San Francisco Ry. Co. v. Bridges***, 131 So. 99, 100 (Miss. 1930) (a claim fully litigated and ruled on by both a lower court and the Supreme Court is foreclosed from further review as *res judicata*); ***Wilkes v. Coopwood***, 39 Miss 348, 350 (1860) (a judgment on the merits of a claim is a bar to a subsequent claim on the same issue).

In the instant case, the Motion to Allow Interest on Judgment did not go to the heart of the issue on appeal, *to wit*, a determination on interest had no effect as to whether the Williamses were entitled to contribution for Owen's portion of the partnership debt. Furthermore, the issue concerning interest on the contribution was addressed by motion and denied by court order but has not been subject to a finding of fact or a final judgment, and therefore has not been fully adjudicated[(5)]. In accord with documented legal trends which discriminate between claims upon which a judgment has been rendered versus a motion upon which an order has been entered, and the cases cited *supra* which require full adjudication for the invocation of *res judicata*, the issue as to interest on the contribution is not barred as *res judicata*. This issue was properly before the chancery court on remand and thus is properly before this Court on appeal today.

IV.

**WHETHER THE INTEREST SOUGHT BY THE WILLIAMSES IS "PRE-JUDGMENT" INTEREST AND UNRECOVERABLE FOR WANT OF PROPER PLEADING?**

Owen argues that the interest sought by the Williamses is "pre-judgment" interest and as such is unrecoverable because the Williamses failed to specifically demand the interest in their original pleadings. Owen argues that the right to interest on the contribution did not mature until the Williamses actually had a right to the contribution which was established by the Supreme Court's judgment on January 28, 1993, in ***Williams I***. Owen urges that the interest sought on the contribution prior to the Supreme Court's reversal in ***Williams I*** is, therefore, "pre-judgment" interest. Assuming that the interest sought is "pre-judgment" interest, Owen argues that the Williamses are not entitled to recover "pre-judgment" interest because such was not specifically pleaded in their original pleading. The Williamses, however, argue that the interest sought is not "pre-judgment" interest because their right to interest is not based on the judgment and arises independently from the doctrine of contribution. As such, the Williamses further argue that a request for general relief in the original pleading, versus the necessity for a specific request for pre-judgment interest, is sufficient to merit recovery for the interest sought.

First, it must be noted that the Williamses are seeking to recover interest on the $99,015 of which they were deprived when the insurance proceeds went towards the satisfaction of the entire partnership debt on August 29, 1988. On July 25, 1988, the chancery court denied the Williamses any right to contribution from Owen. The Supreme Court then reversed the chancery court's decision on January 28, 1993, and rendered judgment requiring contribution. Hence, it was not until the Supreme Court rendered its decision on January 28, 1993, requiring contribution that that right came to fruition. That is to say, if the Supreme Court had not required contribution, the Williamses would have no monetary amount on which to claim interest. Therefore, it is disingenuous for the Williamses to aver that their claim for interest is independent of their right to contribution; for it is inherently tied thereto. With the right to interest inherently tied to the right to contribution, and with the right to contribution not maturing until the judgment of January 28, 1993, the interest sought by the Williamses on the $99,015 contribution from August 29, 1988, to December 31, 1992, is necessarily "pre-judgment" interest.

Having determined that the interest sought is "pre-judgment" interest, it is now necessary to determine whether the demand for said interest was properly pleaded. This Court has consistently held that when "pre-judgment" interest is not specifically demanded in the pleadings it is unrecoverable. *Thompson Machinery Commerce Corp. v. Wallace*, 687 So. 2d 149, 152 (Miss. 1997); *Century 21 Deep South Properties v. Keys*, 652 So. 2d 707, 719 (Miss. 1995); *Wirtz v. Switzer*, 586 So. 2d 775, 785 (Miss. 1991); *Simpson v. State Farm Fire and Casualty Co.*, 564 So. 2d 1374, 1381 (Miss. 1990). Both parties have misplaced their arguments in focusing on the sufficiency of the pleadings in the suit leading up to *Williams I*. When the Supreme Court rendered judgment concerning the Williamses' right to contribution and remanded for a determination on interest and distribution on January 28, 1993, the right to "pre-judgment" interest matured. Therefore, it is necessary to consider the pleadings[6] filed with the chancery court on remand in order to determine whether the demand for "pre-judgment" interest on contribution was properly pleaded. Upon remand, the Williamses filed an Amended Motion to Determine Interest Due on Judgment with the chancery court. It was this motion that was denied by the chancery court when the court determined that the Williamses were not entitled to "pre-judgment" interest. The Williamses' amended motion states in relevant part:

> That the Estate of Charles Williams is, therefore, due interest from Defendant, Joe Sam Owen, from the date of August 24, 1988 at the legal rate on the sum of $99,015.00.

> WHEREFORE, PREMISES CONSIDERED, your Petitioner would pray that upon a hearing hereon, this Court [sic] will determine the correct amount of interest to be paid to the Estate of Charles Williams, Deceased, by Joe Sam Owen.

This Court requires that for a sufficient pleading for "pre-judgment" interest: (1) the amount due must be liquidated when the claim is originally made; or (2) in cases involving the denial of an insurance claim, the denial of said claim must be frivolous or in bad faith; and (3) the pleadings must set forth the date from when the interest is allegedly due. *Thompson Machinery Commerce Corp. v. Wallace*, 687 So. 2d 149, 152 (Miss. 1997). It is undisputed that, at the time the chancery court received this case upon remand, the partnership debt had been satisfied with the insurance proceeds on August 29, 1988, and the Williamses had received contribution in the amount of $99,015 on December 31, 1992. Thus, the amount of interest sought is liquidated. Furthermore, the Williamses

alleged in their motion that the interest is due as of August 24, 1988[7]. In accord with the dictates set by this Court concerning claims for "pre-judgment" interest, the amount due was liquidated and the pleadings set forth a date from when interest was allegedly due. Therefore, the Williamses' pleading is sufficient for the interest sought, and the "pre-judgment" interest is recoverable.

## V.

## IF INTEREST IS DUE, WHETHER EX PARTE CONTACTS BY THE WILLIAMSES' COUNSEL UNREASONABLY DELAYED OWEN'S PAYMENT OF CONTRIBUTION TO THE WILLIAMSES THUS AFFECTING THE PERIOD OF TIME FROM WHICH INTEREST SHOULD BE RECOVERED?

Owen finally argues that between the time Owen placed $100,000 into the escrow account and the time the escrow funds were released for payment on the contribution, the Williamses' counsel, Mr. Logan, engaged in unethical and improper *ex parte* contacts which had the effect of delaying payment from Owen's escrow account to the Williamses effectively increasing the amount of interest sought by the Williamses. The Williamses have chosen not to address the allegations by Owen or the findings of fact by the chancery court concerning the *ex parte* contacts stating that, "the matter of the alleged ex parte contacts has been addressed by Appellant in a Motion to Strike and will not be repeated herein." Therefore, the facts as found by the chancery court stand unrebutted.

The chancery court's findings of fact reflect that after the original decision in ***Williams I*** was handed down by the Supreme Court on August 19, 1992, which required contribution of $99,015 paid by Owen to the Williamses, the following events transpired:

> November 25, 1992 , Mr. Williams' motion to reconsider or in the alternative for clarification by written opinion [sic] was served. The motion was not accepted by the Supreme Court for filing was returned to Mr. Logan unfilled [sic]. . . .

> November 25, 1992, letter from Mr. Logan to . . . the Peoples Bank . . . advising that Logan had filed a motion for reconsideration with the Supreme Court on the issue of interest and that disbursement of the escrow account should await the Supreme Court's decision. . . .

> On December 1, 1992, Mr. Logan's motion to reconsider or in the alternative for clarification by written opinion [sic] . . . was not accepted by the Supreme Court for filing and was returned unfilled [sic] to Mr. Logan by the Supreme Court Clerk. . . .

> . . . .

> . . . .

> On December 18, 1992, there's a letter from Mr. Logan to Mr. Welter at Peoples Bank who is the escrow agent advising that the interest matter before the Supreme Court was not concluded and that the decision of the Supreme Court was not final. . . .

> On December 29, 1992, there's a letter from Mr. Logan to Mr. Swetman of the Peoples Bank, escrow agent, advising that the issue of the interest in the mandate of the Supreme Court is still not decided finally. . . .

On January 28, 1993, the Supreme Court on its own motion considered en banc on January 21, 1993, the mandate that it had issued on November 6, 1992, and withdrew it and the opinion issued on August 19, 1992, was withdrawn and a substitute opinion and mandate was [sic] issued.

As noted *supra*, the bank paid $99,015 from Owen's escrow account to the Williamses on December 31, 1992. Thus, from the chancery court's findings of fact, it appears that the Williamses's counsel's actions beginning on November 25, 1992, served to delay the bank from disbursing the $99,015 from Owen's escrow account to the Williamses. As Owen clearly points out, the Williamses' motion of November 25, 1992, was improper, because it was not in accord with Rule 40 of the Mississippi Rules of Appellate Procedure. Therefore, no issue as to recoverable interest was pending[8] before the Supreme Court on November 25, 1992, when the Williamses' counsel contacted the bank to advise against the disbursement of escrow funds. There is evidence in the record suggesting that the Williamses' counsel's knowledge as to the Supreme Court's *sua sponte* action in reconsidering and rerendering a revised mandate and opinion in ***Williams I***, was based upon *ex parte* contacts made with Magistrate Judge Jack B. Weldy of the Supreme Court. Whether these contacts were made in good or bad faith, they are nonetheless not sanctioned by the Mississippi Rules of Appellate Procedure and are thus extraordinary and overreaching. The extraordinary efforts made by the Williamses' counsel in contacting the magistrate judge and misrepresenting to the bank that issues were pending before the Court were improper and apparently resulted in the delay of payments from the escrow account by the bank to the Williamses. Under the "clean hands" doctrine a party seeking relief in equity whose hands are not clean due to wilful misconduct, inequity, or fraud, will be denied the aid of equity. ***Calcote v. Calcote***, 583 So. 2d 197, 199-200 (Miss. 1991). In the case at bar, wilful misconduct transpired on November 25, 1992, when misrepresentations were made to the bank by the Williamses' counsel. To the extent that this act of misconduct delayed payments from the escrow account, equitable interest thereon is denied from the date of initial delay. Therefore, recoverable interest in this case is calculated from August 29, 1988, to December 31, 1992, less the interest which accrued after November 25, 1992, when contacts which first caused a delay in the disbursement of escrow funds took place.

## CONCLUSION

The Williamses had a lawful right to contribution on payment for the partnership debt. In equity a lawful right to contribution inherently carries with it a lawful right to interest on said contribution for the period of time during which the party owed the contribution was denied that sum. The Williams-Owen Settlement Agreement unambiguously indicates that the parties anticipated and intended to include interest on the contribution. Since judgments on cases and orders on motions are treated differently under the doctrine of *res judicata*, the subject of this appeal was properly before the chancery court upon remand, and *res judicata* was not a bar to the consideration thereof. The judgment sought by the Williamses is "pre-judgment" interest and was properly pleaded when considered upon remand. Finally, improper acts by the Williamses' counsel resulting in a delay of escrow payments which increased the amount of interest thereon, contravened the equitable "clean hands" doctrine and, therefore, adversely affected the equitable period for recovery of interest. We now reverse the judgment of the chancery court and render judgment requiring Owen to pay the Williamses interest at the legal rate of 8% pursuant to § 75-17-1 of the Mississippi Code on the $99,015 amount of contribution from August 29, 1988, to November 25, 1992, for a total of $41,905.

**REVERSED AND RENDERED.**

**PRATHER, P.J., PITTMAN, BANKS, McRAE, ROBERTS, SMITH AND MILLS, JJ., CONCUR. LEE, C.J., NOT PARTICIPATING.**

1. The facts set forth in the Factual Background are taken from ***Williams v. Owen***, 613 So. 2d 829, 830-34 (Miss. 1993) ("***Williams I***").

2. $300,000 including the $100,000 for the accidental death coverage.

3. The appellants in this case are George Williams, Executor of the Estate of Charles M. Williams, deceased; George Williams, and Mary Williams, individually, and will hereafter be referred to collectively as "the Williamses."

4. In comparison, the original mandate of August 19, 1992, stated, "Reversed and Rendered Consistent with the Opinion of this Court."

5. "Adjudicate" is synonymous with "adjudge" and thus implies "a judicial determination of a fact, and the entry of judgment [thereon]." Black's Law Dictionary 42 (6th ed. 1990).

6. Owen suggests that the request for "pre-judgment" interest must have been in the original trial court pleadings. However, Owen fails to note that at the time the original trial court pleadings were filed, interest could not have been an issue because the partnership debt had not yet been paid. Any interest pled in the original trial court pleadings would have been for "post-judgment" interest. Pleading "pre-judgment" interest in the original trial court pleadings would have entailed an unusual feat of clairvoyance.

7. In their pleadings, the Williamses mistakenly requested interest from August 24, 1988, however, the partnership debt was satisfied on August 29, 1988. It is only important that a date from when interest is allegedly due is pleaded in order to establish that the interest sought is "pre-judgment" interest. ***See Thompson Machinery Commerce Corp. v. Wallace supra***. This requirement is satisfied by the request, albeit erroneous, for interest from August 24, 1988.

8. Although the Court did revise the opinion and mandate on January 28, 1993, this action was *sua sponte*, and does not constitute a pending issue as a result of litigious process.